# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP  DIVISION

| | | |
|---|---|---|
| **INFINITE ALLAH,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12CV00033 |
| | ) | |
| v. | ) | **OPINION SETTING FORTH** |
| | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| **COMMONWEALTH OF VIRGINIA,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*James A. DeVita, Arlington, Virginia, for Plaintiff; Kate E. Dwyre, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendant.*

In this action based upon the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C.A. §§ 2000cc to  2000cc-5 (West 2012), the plaintiff, a state prison inmate and adherent of a group called the Nation of Gods and Earths ("NGE"), claims that the Virginia Department of Corrections ("VDOC") has substantially burdened his exercise of religion by refusing to (1) recognize NGE as a religion; (2) allow him to meet communally with other members of NGE; (3) allow him to wear clothing items indicating his adherence to NGE; (4) accommodate his preferred diet; and (5) allow him to possess NGE materials and publications.  Based upon the evidence submitted at a bench trial,

and for the following reasons, I will deny relief and enter judgment for the defendant.

# I. PROCEDURAL BACKGROUND.

This action was filed pursuant to 42 U.S.C.A. § 1983 (West 2013) by plaintiff Infinite Allah, also known as David Mitchell Turner, against Commonwealth of Virginia ("Commonwealth"). He seeks injunctive relief under RLUIPA preventing the Commonwealth from burdening the exercise of his religious beliefs.[1] The Commonwealth initially filed a Motion to Dismiss. It asserted that the plaintiff had failed to state a claim upon which relief could be granted under RLUIPA because as a matter of law, NGE is not a religion. I denied the motion, concluding that although several other courts have decided based on the record before them that NGE does meet the recognized definition of a religion,[2]

---

[1] The plaintiff filed an earlier action in this court, making similar claims. While I denied the Motion to Dismiss in that case, finding that the Commonwealth had failed to show that the plaintiff had not adequately exhausted his prison administrative remedies, *Infinite Allah v. Virginia*, No. 2:10CV00075, 2011 WL 251214, at *5 (W.D. Va. Jan. 25, 2011), the parties stipulated to a dismissal of the case without prejudice prior to trial.

[2] *See Coward v. Jabe*, Nos. 1:10cv147(LMB/TRJ), 11-6754, 2012 WL 6651929, at *4 (E.D. Va. Dec. 19, 2012), *vacated and remanded*, 532 F. App'x 328 (4th Cir. 2013) (unpublished); *Versatile v. Johnson*, No. 3:09CV120, 2011 WL 5119259, at *13 (E.D. Va. Oct. 27, 2011), *aff'd*, 474 F. App'x 385 (4th Cir. 2012) (unpublished), *cert. denied*, 133 S. Ct. 1261 (2013). For a history of NGE consistent with the evidence presented at trial, and its general treatment by the courts, see Justin L. Sowa, Note, *Gods Behind Bars: Prison Gangs, Due Process, and the First Amendment*, 77 Brook. L. Rev. 1593, 1605-1612 (2012).

the plaintiff might present different evidence, or subscribe to a set of beliefs different from those presented in other cases. *Infinite Allah v. Virginia*, No. 2:12CV00033, 2013 WL 101665, at *3 (W.D. Va. Jan. 8, 2013). Next, the Commonwealth moved for summary judgment, which I also denied, finding genuine disputes as to material facts, such as the existence and extent of violent incidents among NGE-affiliated inmates. *Infinite Allah v. Virginia*, No. 2:12CV00033, 2013 WL 5435607, at *2 (W.D. Va. Sept. 27, 2013).

Thereafter, a three-day bench trial was held at which the parties presented extensive testimony and exhibits. Following preparation of the trial transcript, the parties have fully briefed the issues and the plaintiff's claims are now ripe for decision by the court.

## II. FINDINGS OF FACT.

As required by Federal Rule of Civil Procedure 52(a), and based on my opportunity to assess at trial the credibility of the witnesses and exhibits, the following are my findings of fact. In determining the facts, I have taken into account the rationality and internal consistency of the testimony, the extent of detail and coherent nature of the testimony, the manner of testifying by the witnesses, and the degree to which the subject testimony is consistent or inconsistent with other evidence in this case.

1.  The plaintiff is a prison inmate in the custody of VDOC, an agency of the Commonwealth.

2.  The plaintiff is a follower of NGE, also known as the Five Percenters, a group containing adherents both inside and outside of prison.

3.  Among other teachings, NGE asserts that black men are the only divinity. NGE posits that the world's population is divided into three categories: "[T]he Ten Percent who teach the Eighty-Five Percent to believe in a mystery God that can not [sic] be seen and the Five Percent who do not believe in the teachings of the Ten Percent . . . ." (Am. Compl. ¶ 6.) The "Five Percent" refers to members of NGE. A principal tenet of NGE is the racial superiority of its members, a doctrine that has considerable potential for violence in the modern prison setting.

4.  VDOC does not recognize NGE as a religious group at any of its prison facilities and does not allow NGE members to communally meet, wear special clothing, or possess NGE materials and publications, nor does it provide a special diet for NGE members.

5.  Whether or not NGE is considered a bona fide religion, it has acted as a prison gang that would pose a threat to the safety and security of VDOC prison facilities if treated as other religious groups. Inmates affiliated with NGE have a demonstrated history of violence and racism.

6.  Communal meetings of NGE members would pose a danger to the safe and secure operation of VDOC prison facilities.   Such meetings present a heightened risk of violence as compared to other groups, and would require a degree of supervision that is not practically feasible.

7.  Identifiable NGE clothing, such as NGE hats and medallions, serve as gang identifiers and aid in recruitment and power displays by NGE gang members, contrary to the safety and security of the prison.

8.  VDOC's current policies and procedures allow the plaintiff meals in general accordance with his claimed religious preferences and any deviation therefrom is de minimus and causes no burden to the plaintiff's exercise of religion.

9.  NGE materials are often handwritten, and can vary from copy to copy. Whether handwritten or typed, most contain racist and/or violent sentiments. Additionally, most contain codes that have the potential to aid inmates in passing messages that circumvent safety and security in the prison.

10.  The principal publication of NGE, called *The Five Percenter,* often contains codes, and racist or violent sentiments.  It is frequently disallowed for inmate use by VDOC for these reasons, although it is generally reviewed on an issue-by-issue basis.

III. ANALYSIS.

The Commonwealth contends that rather than being a religion, NGE is a gang and security threat group that is simply not entitled to protection under RLUIPA. In the alternative, it argues that the restrictions placed upon the plaintiff's religious exercise are the least restrictive means of furthering a compelling state interest in prison safety. After careful consideration of the evidence at trial, I do not find it necessary to determine whether NGE is in fact a bona fide religion. Instead, I find that VDOC's policies and procedures pertaining to NGE at issue in this case are the least restrictive means of furthering a compelling state interest in prison safety.

## A. RLUIPA.

The plaintiff asserts a claim under RLUIPA, which protects the religious exercise of institutionalized persons. The general rule of RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a). RLUIPA assigns burdens as follows:

> If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

§ 2000cc-2(b). "A plaintiff bears the burden of persuasion on whether the policy or practice substantially burdens his exercise of religion. If the plaintiff satisfies this requirement, the government must then prove that the challenged policy is the least restrictive means of furthering a compelling governmental interest." *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (internal citations omitted).

RLUIPA sets forth a broad definition of "religious exercise" that extends beyond institutional religions. RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(A). Under RLUIPA, a plaintiff must demonstrate that his religious beliefs are sincerely held in order to establish a protected right. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). However, a court may "'not judge the significance of the particular belief or practice in question.'" *Smith v. Ozmint*, 578 F.3d 246, 251 (4th Cir. 2009) (quoting *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir. 2006)). Accordingly, even if a plaintiff practices in a way that differs from the recognized practices of a particular religion, the plaintiff's religious exercise is protected. *See Lovelace*, 472 F.3d at 188 ("Such

an inmate's right to religious exercise is substantially burdened by a policy, like the one here, that automatically assumes that lack of sincerity (or religiosity) with respect to one practice means lack of sincerity with respect to others.").

At trial the parties presented conflicting testimony from two experts regarding whether NGE is a religion entitled to protection under RLUIPA. The plaintiff presented testimony from Theodore Swedenburg, Ph.D., a professor of anthropology at the University of Arkansas, who opined that NGE is a religion that believes "[t]he black man is the god of the universe" and "divinity resides within the black man." (Trial Tr. 6, Oct. 30, 2013.) In turn, the Commonwealth presented testimony from Randy Myers, president of Chaplain Service Prison Ministry of Virginia, who opined that NGE is not a religion, but instead is a cultural movement that teaches racial supremacy. He expressed an opinion that while many NGE members use religious language and state that divinity resides within the "Asiatic black man," such language is used to refer to a philosophy of self-empowerment. (Trial Tr. 41, Oct. 30, 2013.)

In spite of the parties' reliance on this evidence, this case does not require the court to resolve these differences in opinion. RLUIPA concerns "the religious exercise of a person," and not a group or institution. 42 U.S.C.A. § 2000cc-1(a). RLUIPA provides recourse for the individual whose religious exercise has been

substantially burdened in the absence of a compelling government interest furthered by the least restrictive means available.

B. SUBSTANTIAL BURDEN.

The Fourth Circuit has a well-settled definition of what constitutes a substantial burden under RLUIPA:

> [A government] policy imposes a substantial burden on religious exercise if it put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand.

*Ozmint*, 578 F.3d at 251 (alterations, citations and internal quotation marks omitted). At trial, the plaintiff testified that he considers NGE a religious group and himself a member of that group. He described some of his beliefs and the relief he seeks. For the purposes of this case, I will assume without deciding that the plaintiff is sincere in his beliefs and that challenged policies and practices of VDOC (other than those relating to diet) substantially burden the plaintiff's religious exercise. Accordingly, the burden of proof is upon the Commonwealth to prove by a preponderance of the evidence that its restrictions are permissible under RLUIPA.

C. COMPELLING INTEREST.

"[P]rison security is a compelling state interest . . . ." *Cutter*, 544 U.S. at 725 n.13. It "deserves 'particular sensitivity.'" *Lovelace*, 472 F.3d at 190 (citing

*Cutter*, 544 U.S. at 722.)  The Supreme Court has stated, "We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722.  The Court explained:

> While the Act adopts a compelling governmental interest standard, context matters in the application of that standard.  Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (alterations, citations and internal quotation marks omitted).

While the decisions of prison administrators are afforded due deference, prison administrators must still provide a "substantive, relevant explanation" to demonstrate a compelling interest.  *Ozmint*, 578 F.3d at 253.  An explanation sufficient to demonstrate a compelling interest in prison security was provided in *Couch v. Jabe*.  There, prison officials demonstrated that a prison grooming policy was connected to a compelling government interest by submitting affidavits that "connected the Policy's restrictions to specific health and security concerns and showed that those concerns are furthered by the Policy."  679 F.3d at 202.  One official explained that long hairstyles and beards "could conceal contraband; promote identification with gangs; create a health, hygiene or sanitation hazard; or could significantly compromise the ability to identify an offender . . . ." *Id.* at 201.

Similarly, in this case, the Commonwealth presented credible testimony explaining why VDOC's policies and procedures (1) classifying NGE as a security threat group and gang; (2) refusing to allow NGE members to communally meet; (3) refusing to allow NGE members to wear special clothing; (4) refusing to accommodate the plaintiff's requested diet; and (5) refusing to allow inmates to possess NGE materials and publications, each further a compelling interest of prison safety. The Commonwealth presented testimony from several VDOC administrators and employees: A. David Robinson, Chief of Corrections Operations; Dr. Louis Cei, Operations Support Manager and Chairman of the Publication Review Committee; Gary Clore, Manager of the Gang and Security Threat Group Management Unit; and Michael Duke, another member of the gang unit. The Commonwealth also presented testimony from Randy Myers, President of Chaplain Service Prison Ministry of Virginia, who acts as a consultant for VDOC.

First, VDOC has offered a substantive, relevant explanation for its decision to classify NGE as a gang and security threat group. Robinson testified that VDOC has experienced six gang-related incidents involving inmates affiliated with NGE in the last two years. He also testified that out of all incidents, 125 involved an inmate affiliated with NGE. Robinson explained that while gang violence is down generally, VDOC has created more than 150 staff positions since 1990 solely

devoted to monitoring gang activity. He testified that more staff is required the larger gangs become.

VDOC also provided examples of violence committed by NGE members through testimony and exhibits. For example, a Disciplinary Offense Report from 2005 described an incident where a NGE-affiliated inmate kicked an officer attempting to remove his leg irons. (Def.'s Ex. 8, at 1.) A search of the inmate's property revealed a note stating, "I'm trying not to let these devils trick me up but I hate these police. I want to do something dangerous to them." The letter was signed "Superior Allah," and NGE lessons were also found in his possessions. (*Id.*)

Finally, Clore opined that NGE meets the definition of a gang that is set forth in the Code of Virginia, which defines a gang as

> any ongoing organization, association, or group of three or more persons, whether formal or informal, (i) which has as one of its primary objectives or activities the commission of one or more criminal activities; (ii) which has an identifiable name or identifying sign or symbol; and (iii) whose members individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction.

Va. Code Ann. § 18.2-46.1 (Supp. 2013). Clore testified that VDOC monitors just under 1,000 inmates for their connections to NGE, and opined that this number would spike if NGE were recognized as a religion. He explained that prospective

gang members must commit crimes in order to join, which poses a security risk to other inmates and staff. VDOC's data on violent incidents connected to NGE-affiliated inmates explains why it has chosen to categorize NGE as a gang and security threat group.

While the plaintiff called as witnesses seven inmate members of NGE who claimed that NGE had not been involved in gang violence in the Virginia prison system since at least 1987, I do not place weight on that testimony, in light of the obvious self-interest of these witnesses. In addition, while it is true, as argued by the plaintiff, that VDOC does not have statistics showing a significant number of recent assaults and other incidents of violence by NGE members, I find that is more likely the result of VDOC's restrictions on NGE activities rather than NGE's propensity.

Second, VDOC has offered a substantive, relevant explanation for why it refuses to allow NGE members to meet in a communal fashion. Myers explained that racist sentiments contained in some NGE materials are one reason why NGE members are not permitted to meet together. He pointed to documents characterizing Caucasian men as "devils," and explained that movements that denigrate other races, religions, or cultures are dangerous in the prison environment because they can lead to violence. Additionally, Duke testified that NGE meetings previously have led to violence. He stated that at some NGE

meetings, a member who is not adequately familiar with NGE lessons will be given "a universal beat down," where meeting attendants form a circle and beat the individual as punishment for not knowing NGE lessons. Duke testified that he has seen and investigated such beat downs within VDOC. (Trial Tr. 171-72, Oct. 30, 2013.) Violence and messages of racial denigration are legitimate reasons to deny meeting rights within a prison.

Third, VDOC has explained why it does not permit NGE members to wear special clothing. The plaintiff requested the ability to wear a hat with a tassel, and a medallion. At trial, he testified that the hat and medallion are symbols of his membership in NGE. He explained, "[I]t lets those around me know exactly how I strive, and what my intentions are . . . which is peace, which is Islam." (Trial Tr. 30, Oct. 29, 2013.) However, VDOC officials testified that because NGE is classified as a gang and security threat group, such symbols are in contravention to its zero tolerance gang policy. Also, Robinson testified that clothing denoting an affiliation with NGE presents a problem for cell compatibility amongst inmates, since other inmates might fear or refuse placement with a cellmate who is visibly a member of NGE, which is viewed as a gang within the prison. Robinson testified that special clothing would enhance NGE's ability to recruit new gang members because its presence within the prison would be more visible. Robinson explained that while there are gangs and subsets of gangs within VDOC, inmates often are

unaware of the affiliations of other inmates. He stated that when they become aware, power struggles and violence often arise. VDOC has adequately explained that its policy banning gang symbols on clothing is meant to counteract gang recruitment and fear among inmates, and promote a neutral, faction-free environment.

Fourth, VDOC has explained that the plaintiff's requested diet is already available to him. At trial, the plaintiff testified that he does not eat pork or tuna fish because these foods are forbidden for NGE adherents. Pork is forbidden because it is "meat of the cloven hoof" and tuna fish is forbidden because it is a fish "considered to be of a scavenging nature." (Trial Tr. 19, Oct. 29, 2013.) Robinson testified that beans or cheese are always available to inmates as a protein alternative to tuna or pork. The plaintiff is able to avoid the two foods that he testified were forbidden for NGE adherents under the standard diet offered to all inmates.

Fifth, VDOC has offered a substantive, relevant explanation for why it does not permit inmates to possess NGE materials such as the Book of Life and *The Five Percenter* newsletter. VDOC officials explained that for safety reasons, inmates are not permitted to possess materials that promote violence or racism, and provided examples of confiscated NGE materials containing violent or racist

sentiments.[3]  Additionally, Robinson testified that NGE materials like the Book of Life, the Supreme Alphabet, and the Supreme Mathematics pose particular difficulties since they not commercially published.  Instead of checking a publication once, prison staff members would have to go through each copy page by page.  Additionally, because some NGE materials contain codes, staff members would have to be trained in reading NGE codes.  Robinson testified that this type of individual attention to each document would be costly when implemented across forty-three prisons that have only three or four people in each mail room.

Duke also presented testimony on the danger that handwritten documents pose.  He testified that the some Books of Life confiscated from NGE members contain symbols, and opined that NGE members are moving to a more advanced code since members of the gang unit have been able to decode their messages that

---

[3] For example, a confiscated copy of "Student Enrollment (1-10)" contained the following language:

1.) Who is the Original Man?

    Ans.) The Original Man is the Asiatic Blackman, the maker, the owner, the cream of the planet Earth, Father of civilization, God of the Universe.

2.) Who is the Colored Man?

    Ans.)  The colored man is the Caucasian White man, Yacubs grafted Devil of the planet Earth.

(Def.'s Ex. 5, at 1.)

employ the Supreme Alphabet and the Supreme Mathematics. He testified that such symbols and codes aid inmates in passing messages that circumvent security.

As to the requested NGE periodical, Cei testified that VDOC does not have a blanket ban on *The Five Percenter*, but that each issue is reviewed de novo. He stated that prior issues of *The Five Percenter* have been disapproved because of coded language and violent sentiments.[4] VDOC's policy of banning materials that

---

[4] Some, but not all, of the examples of violent, racist, or coded messages contained in *The Five Percenter* that were offered by VDOC are contained below:

> BLOODS WILL BECOME GODS AS SOON AS THEY ARE GIVEN THE BASIC AWARENESS TO FIGHT **FOR** THEIR OWN PEOPLE AND NOT TO FIGHT **AGAINST** THEIR OWN PEOPLE. THEY WILL BECOME SOME OF THE **GREATEST** GODS & EARTHS WHO EVER CAME INTO THIS NATION! MANY A GREAT GOD & EARTH HAD GANG ORIGINS B-4 THEY GOT THE KNOWLEDGE. **WE MUST TEACH THEM! K7**

(Def.'s Ex. 16.)

> I DON'T KNOW IF YOU REMEMBER ME BORN-U-TRUTH I AM THE GOD THAT WROTE THE PLUS LESSON "THE BUILD: THE WHITE MAN IS THE DEVIL" I WAS A SUBSCRIBER OF THE POWER PAPER, EVERY PAPER FROM 1998-2006 WHEN THE DEVIL (VDOC) STOPPED US FROM BEING ABLE TO PURCHASE THE PAPER, AND THEY STARTED CONFISCATING ALL MATERIAL PERTAINING TO OUR CULTURE. . . .
>
> . . . .
>
> COULD YOU SEND ME A COPY OF EACH ARTICLE THAT YOU'RE GOING TO PRINT IN THE POWER PAPER, FOR EACH MONTH PRIOR TO YOU PRINTING IT IN THE POWER PAPER? THAT WAY THE GODS HERE WILL GET THE POWER PAPER, JUST NOT IN THE NEWSPAPER FORM. . . .

espouse violent or racist sentiments, and its policy of banning handwritten materials that facilitate the ability of inmates to pass messages in code, are both connected to the compelling state interest of prison safety.

---

. . . .

DRAW IT UP GOD AND LET ME KNOW WHAT YOU CAN DO AND HOW YOU CAN DO IT TO AVOID THE DEVIL'S EYE. . . .

(Def.'s Ex. 20.)

We know how to teach that the Blackman is God and the white man is the devil. . . .

. . . .

The Blackman is God, period point blank. So to all of you still seeking to mix, dilute or tamper with our truth, know that you will not succeed. There is only one God and he is the Blackman. . . . The difference is the one God Allah is manifested in the many bodies of the Blackman and the devil is manifested in the many bodies of the white man.

(Def.'s Ex. 21, at 3.)

ALLAH TAUGHT US THAT THE BLACK MAN IS GOD, BUT NOW BROTHERS SAY THE WHITE MAN IS GOD! . . . THESE WARPED TEACHINGS ARE DESIGNED TO MAKE OUR NATION NOTHING! THEY ATTACK THE VERY PREMISE OUR NATION WAS BUILT ON! FIRST THEM BROTHERS SAID THE WHITE MAN WAS THE DEVIL, NOW THEY SAY THE WHITE MAN IS GOD?? . . . . ALLAH SAID, "THERE ARE ONLY TWO PEOPLE ON THE PLANET EARTH GOD AND THE DEVIL." IF YOU SAY THE BLACK MAN IS GOD AND THE WHITEMAN IS GOD, WHO IS THE DEVIL? JUST BECAUSE I CALL THE WHITE MAN A DEVIL, IT DOESN'T MAKE ME ANTI WHITE. I'M JUST POINTING OUT HIS NATURE TO HIM. . . .

(Def.'s Ex. 21, at 12.)

## D. LEAST RESTRICTIVE MEANS.

The Fourth Circuit has stated that when the government attempts to demonstrate that it has chosen the least restrictive means, the government's first job is "to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs." *Lovelace*, 472 F.3d at 190. It also requires "that the government, consistent with the RLUIPA statutory scheme, acknowledge and give some consideration to less restrictive alternatives." *Couch*, 679 F.3d at 203.

For example, in *Couch*, even though prison officials had demonstrated that a prison grooming policy was connected to a compelling government interest, the Fourth Circuit vacated and remanded a district court's grant of summary judgment to prison officials because the prison officials had not demonstrated that the policy was the least restrictive means available. The court held that an affidavit supporting the prison officials' position "was general and did not indicate consideration of less restrictive alternatives." *Id.* It noted that the affidavit "failed to explain how the prison could accommodate other exceptions to the grooming policy but could not accommodate a religious exception." *Id.* (referring to female prisoners' longer hair and a medical exception for those whose skin was irritated by shaving). It also noted that "at no point did [prison officials] even assert that

the Policy was the least restrictive means of furthering the identified compelling interests." *Id.* at 204. In contrast, VDOC has provided explanations for its policies as discussed above, and also demonstrated that for each policy, it considered other alternatives. After reviewing all of the evidence presented on this issue, I find that VDOC has proved that it chose the least restrictive means available to achieve its compelling interest in prison safety.

First, VDOC has demonstrated that its decision to classify NGE as a gang and security threat group, employs the least restrictive means possible to further a compelling interest in prison security. VDOC has an extensive list of incidents involving inmates affiliated with NGE, and has recorded six gang-related incidents involving NGE in the last two years. VDOC officials also testified to their own recent and historical experiences with NGE inmates. For example, Duke testified about an incident occurring a few months before his testimony where an inmate affiliated with NGE stabbed two members of the Gangster Disciples, which Duke attributed to gang rivalry. Similarly, Clore testified about an incident where an inmate affiliated with NGE assaulted another inmate who disagreed that the NGE member was a god. Clore opined that NGE rhetoric referring to the white man as the devil is not conducive to safe and secure prison facilities, since prisons are multicultural environments. He also opined that the current policies and

procedures of VDOC, such as classifying NGE as a gang and security threat group, keep NGE from growing as aggressively as it did in the nineties.

VDOC has also considered alternatives to its current policies and procedures, such as housing all members of NGE together. Both Robinson and Clore testified that this is not feasible due to the design of VDOC facilities and the number of inmates associated with NGE.

In *Mickle v. Moore* (*In re Long Term Administrative Segregation of Inmates Designated as Five Percenters)*, 174 F.3d 464 (4th Cir. 1999), the court rejected the Five Percenters' argument that they should not be categorized as a security threat group within the South Carolina Department of Corrections because only some inmates claiming affiliation were promoting racism or violence. The court reasoned:

> Confronted with multiple reports of an identifiable group whose members not only threatened but had actually committed serious, violent acts in the [state prison] system and elsewhere, [the Commissioner's] decision to designate the Five Percenters as [a security threat group] was manifestly a rational action.

*Id.* at 470. VDOC must adhere to a higher standard; it must employ the least restrictive means of furthering a compelling interest in prison safety. However, VDOC has demonstrated that NGE falls under the definition of a gang as set forth in the Code of Virginia. VDOC has documented numerous incidents involving NGE members, and has stated that it is unable to separately house all NGE

members.  Given the collective record of violence among inmates claiming affiliation with NGE, VDOC's characterization of NGE as a gang and security threat group is the least restrictive means of furthering its compelling interest in prison security.

Second, VDOC has demonstrated that its policy banning NGE members from meeting employs the least restrictive means possible to further a compelling interest in prison safety.  VDOC considered and allowed NGE to assemble in the past, but eventually revoked the privilege due to security risks.  Robinson testified that NGE is not allowed to meet now because of previous incidents, the number of inmates involved, risks to staff and other inmates, and limited financial resources precluding additional staff supervising meetings.  Although many religious groups are allowed to meet, Robinson testified that due to NGE's history, it would require comparatively more supervision.  Similarly, Clore gave examples of dangerous activities that occurred at NGE meetings when he was a corrections officer at Powhatan Correctional Center in the early nineties.  He testified that inmates at the meetings discussed killing fair-skinned people, and that there were several times when VDOC had to shut the meetings down due to disruptive attendees.  He also stated that he observed NGE members assembling in the recreational yard and practicing ways to counteract law enforcement techniques such as the spread eagle

pat down.  He stated that during these paramilitary drills, he observed visible rank structure among the members.

Eventually, due to incidents like the ones recounted by Clore, NGE was not allowed to meet pursuant to a memorandum dated July 23, 1996.  (Def.'s Ex. 19.) Clore testified that after NGE was taken off the authorized list for mass assembly, the number of inmates who identified as NGE members dropped drastically. While not all inmates affiliated with NGE may desire to engage in prohibited activity, NGE members' collective history of violence and current record of violence, paired with the themes of racial superiority common across different subsets of NGE, lead me to conclude that VDOC is employing the least restrictive means necessary to further its compelling interest in prison security by forbidding NGE from meeting.

Third, VDOC has demonstrated that its policy banning NGE members from wearing special clothing employs the least restrictive means possible to further a compelling interest in prison security.  This policy is closely tied to VDOC's categorization of NGE as a gang.  The primary reason that external identifiers such as the hat and the medallion are not allowed is because VDOC views them as a means of showing solidarity with a gang.  Robison considered the alternative of allowing NGE members to wear items that signified their membership, and concluded that it would compromise security.  Clore testified that when gangs are

allowed to display their affiliation, they are able to brag about their numbers, intimidate smaller groups, and intimidate staff, employees, and volunteers. As discussed above, VDOC has proven that categorizing NGE as a gang and security threat group is the least restrictive means of furthering its compelling interest in prison security. VDOC's zero tolerance policy regarding gang activity is the mechanism that it uses to reduce violence and ensure prison safety. There is no alternative that allows NGE members to display NGE affiliation that also complies with VDOC's zero tolerance policy for gangs.

Fourth, VDOC's current policies and procedures allow the plaintiff meals in general accordance with his claimed religious preferences. The standard diet allows all inmates to choose beans or cheese as an alternative protein to pork or tuna. Any deviation from the plaintiff's claimed religious preferences is de minimus and causes no burden to the plaintiff's exercise of religion.

Fifth, VDOC has demonstrated that its ban on NGE materials and its de novo review of the NGE periodical *The Five Percenter* employs the least restrictive means possible to further a compelling interest in prison security. VDOC has demonstrated that some NGE materials contain codes or racist and/or violent sentiments, and has considered alternatives to a complete ban on such materials. Robinson credibly testified that the alternative of redacting NGE materials has been rejected as non-feasible. He explained that redaction is time-

consuming, costly, and creates problems with consistency from facility to facility. He stated that allowing redaction is problematic because people might start requesting redaction of letters and other documents, which is not feasible given the thousands of documents that come into VDOC. He also stated that there is a general policy of not allowing inmates to possess redacted material because the alteration of books and documents can create a place to hide contraband, and aid inmates in the creation of coded messages (if they redact materials as opposed to prison officials).

Robinson testified that the alternative of allowing inmates to possess NGE materials in their cells only has been also rejected. He explained that permitting such materials in cells "creates a security problem in regard to recruitment of other members, and passing and sharing of information." (Trial Tr. 48, Oct. 31, 2013.) VDOC has considered alternatives to banning NGE materials, and has not found any procedure that allows inmates to possess NGE materials while simultaneously ensuring that VDOC facilities are safe and secure. I find this decision credibly supported by the legitimate security needs of the prison system.

IV. CONCLUSIONS OF LAW.

1. This court has subject-matter jurisdiction and personal jurisdiction over the parties.

2. The Commonwealth has proved by a preponderance of the evidence that the asserted burdens on the plaintiff are in furtherance of a compelling state interest, and the least restrictive means of furthering that compelling state interest.

3. VDOC's categorization of NGE as a gang and security threat group is similarly supported by the evidence and is an appropriate security measure that is the least restrictive means of furthering a compelling state interest in prison safety.

4. Due to staff limitations and safety risks to staff and inmates, a complete ban on NGE communal meetings is the least restrictive means of furthering a compelling state interest in prison safety.

5. Because NGE hats and medallions can serve as a gang identifiers and aid in gang recruitment, a complete ban on NGE hats and medallions is the least restrictive means of furthering a compelling state interest in prison safety.

6. VDOC's decision not to offer a specific diet for the plaintiff does not burden his exercise of religion.

7. Due to the inability of VDOC to review all handwritten NGE materials, and the frequency with which typed and handwritten NGE materials contain codes, racist sentiments, and/or violent sentiments, the decision of VDOC to ban such NGE materials is the least restrictive means of furthering a compelling state interest in prison safety.

8.   The policy of VDOC to refuse possession by inmates of *The Five Percenter* containing material not in compliance with VDOC standards is the least restrictive means of furthering a compelling interest in prison safety.

9.   The plaintiff has not proved a violation of his rights under RLUIPA and is not entitled to relief.

## V. Conclusion.

For the reasons stated, the plaintiff's requested injunctive relief will be denied.   A separate judgment will be entered pursuant to Federal Rule of Civil Procedure 58.

DATED:   April 28, 2014

/s/  James P. Jones                    
United States District Judge